IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | CRIMINAL NO.: 15-CR-10046-LTS |
| --- | --- |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | UNDER SEAL |
| ) | |
| MARTIN LUSTGARTEN-ACHERMAN, ) | |
| Defendant ) | |

## APPEAL FROM MAGISTRATE JUDGE'S
## ORDER OF PRE-TRIAL DETENTION

NOW comes the Defendant Martin Lustgarten-Acherman ("Defendant"), by and

through his undersigned counsel, Nathan P. Diamond, Esquire, and hereby respectfully

files this appeal and moves this court pursuant to 18 U.S.C. §3145(b) to review the order

for the pre-trial detention of the Magistrate Judge in the Southern District of Florida on

April 13, 2015, and as further ordered by the Memorandum and Order of Magistrate

Judith Gail Dein filed with this court as DN # 59 on June 17, 2015.

## I.  INTRODUCTION:

The Defendant is a 50-year-old male, being happily married just once and for the

previous 25 years, and having been blessed with two exceptional daughters, ages 18

and 21. He enjoys having no criminal history as noted in the pertinent Pre-Trial Services

Report dated April 8, 2015. Accordingly, he has never defaulted or failed to show in a

timely manner as may be required before any court proceedings of any kind or nature

anywhere. He certainly poses no safety risk or danger to the community in which he may

be released, and will no doubt fully comply with the appropriate release conditions as

may be determined by this court.   Additionally, his immediate family members and

relatives are ready, willing and able to provide their homes as collateral for security for

that may be required in that regard by this court. In fact, they all appeared personally in

this court at great travel expense and inconvenience from Miami for his recent hearing

held before Magistrate Dein on June 12, 2015.

There has been previously filed under seal with this court the Defendant's Reply

to Government's Opposition for Reconsideration of Pre-Trial Detention Order, which is

incorporated herein by reference and made a part hereof. There is discussed therein at

[redacted] This comment is objectionable on a litany of levels, but at

a minimum [redacted]

further discussed hereinafter, at all times relevant hereto the Defendant had in fact

[redacted]

can best be characterized as that of a semantical miscommunication and dispute that

arose between the parties during 2014.   It was this relatively inconsequential event

[redacted]

hereinafter.

What is highly relevant for purposes of this review is the fact that the Defendant to his great credit is indeed a practicing Orthodox Jew, and he is very proud of the fact that he was brought up and continues to live and worship within his so-called "tight-knit Jewish community." Perhaps the value and strength of this positive connection and the ties to the Defendant's beloved Jewish community can best be exemplified by the fact that his Rabbi flew up here on his own time and expense just last Wednesday, June 16th. He came to visit and pray with the Defendant, which he did for an extended period of time during the contact visit he was permitted to have at the Wyatt Detention Center. Accordingly, and despite the apparent contrary negative views of the government, it is in significant part because of this life-long commitment to his religious community and his family members that not only diminishes the likelihood of the Defendant being a flight risk, but it is suggested to this court that it is one of many factors that makes his risk of flight *de facto* one that is in essence non-existent.

Finally, although not appearing to be necessary, if the court deemed it appropriate to require additional security in the form of a corporate surety, that arrangement is one that may be considered collectively through the family members of the Defendant, provided that it be in a reasonable sum.

## II.   CONTEXT OF OPPOSITION BY GOVERNMENT:

The government asserts two basic objections and arguments to the release with conditions of the Defendant which are discussed as follows:

(a)   **The government has asserted that the Defendant was born and is a citizen of Venezuela (and holds an Austrian passport through his wife), and that**

3

**were he to return to Venezuela there** is the issue of there being no extradition treaty **between our country and Venezuela.**

This certainly is a concern that in most circumstances is one of many appropriate factors for consideration by the court. However, in this unique situation, the Defendant and his family have permanently relocated to Panama in 2010, along with thousands of other middle and upper class Venezuelan citizens, to escape the rapidly deteriorating physical safety of their daily life in Venezuela.   All of these families had become plagued not only with the ongoing and worsening abysmal economic conditions, but what became utterly intolerable was the fact that armed robberies, kidnappings (particularly of their children), etc., unfortunately became a common every day occurrence.

Additionally, a considerable amount of time is spent each year in the condominium apartment owned by the Defendant and his wife in Miami in order to be with all of the other members of both their families. The parents of the Defendant's wife actually reside in their same apartment building in Miami, the Defendant's brother is a surgeon living in Miami, and he has another brother recently relocated to Miami, etc. In fact, the Defendant actually has community ties to our Boston area having an 18-year-old daughter entering her sophomore year at Boston University, and a 21-year-old daughter who has just recently graduated from Bentley College.

More importantly, during all times relevant hereto 

copy of which is attached hereto as **"Exhibit A"** and is incorporated herein by reference.

presented in support of his release with conditions to the court in prior detention

proceedings. However, for purposes of this appeal and review it is not merely the



and without any exceptions, each and every one of the multiple of times and occasions

So, the Defendant's most recent personal history

Certainly, and as will be further discussed

hereinafter, based upon a review of the thousands of pages of documents provided by

the government to date as part of their automatic discovery

one can only conclude that

 

**(b)    The government has asserted that because the Defendant had**

**overseas bank accounts in Hong Kong, Switzerland and Austria, that these**

**accounts at times involved large account balances, and despite their having**

**seized all of such accounts, that there still exists the hypothetical possibility that**

there may be some hidden assets or accounts that could allow him to live *in absentia.*

This is often a significant argument for the government to use, and a factor for the court to consider in deciding the issue of pre-trial detention -- but not one that is appropriate in the facts and circumstances involving this Defendant. The Defendant has since 2006 been involved in a lawful manner in the international financial services industry, and has owned and operated a lawful international financial services company specializing in purchase order financing, and in currency exchange transactions specifically and exclusively involving the purchase and sale of the currency of Venezuela (bolivars). See attached hereto as **"Exhibit B"** the Memorandum ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, being attached hereto and made a part hereof.

Certainly, foreign companies (such as the Defendant's) maintaining overseas accounts in politically stable countries, having financially healthy banking systems that are highly capitalized, and that offer favorable tax treatments, is not *per se* unlawful. Most, if not all, of our own Fortune 500 companies, the big pharmaceutical companies, etc., all engage in this very same practice as a matter of prudent international tax and financial planning. I believe even Mitt Romney was accosted by the media for his overseas accounts and investments during the 2012 election season, but not even the *New York Times* accused him of engaging in an unlawful activity in doing so.

The banking accounts in question were all ones that were lawfully established and existing, and the use and conduct of the Defendant with these accounts represented nothing more than usual and customary international financial transactions, and with no

6

evidence showing any intent to deceive law enforcement or banking regulators.   This plain and simple fact is evidenced by the government admittedly having no difficulty in identifying, finding and seizing them (being evidence of lawful activity with nothing to hide).   Most all of these accounts go back to having been established over a period of years.

Indeed, the government had previously investigated most of, if not all, of these same bank accounts of the Defendant back during their intensive investigation in 2010 in the so-called Rosemont case that they have referenced in this indictment.   As a result of that investigation, and the complete cooperation of the Defendant in explaining the documentation of each and every bank account and transaction involved in that investigation, and with the proof of the extensive due diligence investigations performed for each and every transaction, the government found no wrongdoing or unlawful activity.

Certainly nothing has changed in the nature and kind of business operations and transactions engaged in by this Defendant since 2010 through the present date.   If anything, and as a result of that expensive and time consuming experience with the government back in 2010, the Defendant has perhaps proceeded even more cautiously and with performing more intensive and complete due diligence investigation in confirming every possible detail and document for all transactions, including the businesses and persons that he is dealing with in these transactions – all of which will be produced and introduced into evidence at the time of trial as being usual and customary business records kept and maintained in good faith.

The other part of this argument by the government for pre-trial detention is that there have been significant sums of money passing through these bank accounts of the Defendant.   A very convenient argument, but a factually unsupported conclusion that rings hollow. By the very nature of being engaged in the currency exchange business is that there are occasions where the transactions represent large sums, but the company is working on margins and commissions as low as 1% and sometimes less. This is not evidence of any unlawful activities, any more than is the fact State Street Bank right here in Boston manages on average 3 trillion dollars a day through it accounts in its capacity as a correspondent bank, its overnight deposits operations and its currency exchange operations.



Further, despite the insistence of the Defendant to exercise his right to a speedy trial, the government has succeeded in essence to render this right a nullity as a practical matter. They have succeeded, despite the objections of the Defendant, in seeking and being granted "excusable delays" for the alleged purposes of completing their automatic

discovery that was initially due on June 4, 2015. 

 This rush to indictment is further evidenced by the fact the government continues to produce its automatic discovery in dribs and drabs, and still claims that it needs even more time to produce more automatic discovery – and being for an indictment that was returned way back on April 1, 2015.

Meanwhile, the consequences of all of the government's actions and omissions are collectively at the great expense of the Defendant. He is relegated to the status of being unjustly cast like the character in Samuel Beckett's play, "Waiting for Godot." The status of the Defendant is that he was arrested and detained since April 8, 2015, and with the continuing "excusable delay" orders, his right to a speedy trial as of this date will not even begin to run until July 31st – and there is no certainty that the 70 days will begin to run even on that date, given the history of this proceeding to date.

It is simply unconscionable, and violates the Defendant's basic rights, for this pre-trial detention, while at the same time denying him his right to a speedy trial.

## III.   REVIEW UNDER THE BAIL REFORM ACT

Under the applicable provisions of 18 U.S.C. §3142 ("The Bail Reform Act"), the judicial officer shall order that, pending trial, the defendant either be:   (1) released on his or her own recognizance, or upon execution of an unsecured bond;   (2) released on a

condition or combination of conditions;   (3) temporarily detained to permit revocation of conditional release, deportation or exclusion; or (4) detained. See 18 U.S.C. §3142(a).

A District Court's review of a Magistrate's detention order is to be conducted without deference to the Magistrate's factual findings.   *United States v. Koenig,* 912 F.2d 1190, 1192-1193 (9th Cir. 1990)("[The district court should review the evidence before the magistrate and make its own independent determination whether the magistrate's finding are correct, with no deference.")

In non-capital cases, pre-trial release is the norm, and should be denied only in rare circumstances. See *United States v. Motamedi*, 767 F.2nd 1403, 1404, 1405 (9th Cir. 1985).   It is a corollary to the presumption of innocence that "the right to bail should be denied only for the strongest reasons."   *Id.* at 1407. Pre-trial detention also implicates the constitutional protections against the denial of liberty without due process and against excessive bail. *U.S. Const. amends. V, VIII.*   The Bail Reform Act of 1984 mandates release of a person facing trial under the least restrictive conditions, or combination of conditions, that will reasonably insure the person's appearance. *See* Montamedi, 767 F. 2d at 1405; *United States v. Byrd*, 969 F.2d 1118, 1121 (5th Cir. 1992)("There can be no doubt that this Act clearly favors nondetention.").   "Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of the Defendant." *United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir, 1991).*   A defendant must be released if conditions can "reasonably ensure" the appearance of the person as required and the safety of any person and the community. 18 U.S.C. §3142(e).

The Bail Reform Act allows for the pre-trial detention of a defendant only if a judicial officer determines that there are no conditions, or combination of conditions, that may exist which will "reasonably assure the appearance of the person."   *See United States v. Xulam*, 84 F.3rd 441, 442 (D.C. Cir. 196), and "the safety of any other person and the community."   *United States v. Rodriguez*, 897 F. Supp. 1461, 1463 (S.D.Fla. 1995); 18 U.S.C. §3142(c). The government must prove by clear and convincing evidence that no combination of conditions can reasonably assure the defendant's appearance and the safety of the community.   *United States v. Chen,* 820 F. Supp, 1208 (N.D. Cal. 1992). The government may not rely solely on the indictment to justify detention. *Id.*

## IV.   THE STATUTORY FACTORS ESTABLISHED IN 18 U.S.C. §3142(g) SUPPORT THE DEFENDANT"S RELEASE ON CONDITIONS.

**(a)   18 U.S.C. §3142(g)(1) – Nature and Circumstances of Offense Charged; and**
**(b)   18 U.S.C. §3142(g)(2) – Weight of the Evidence Against the Defendant.**

With due regard to the weight and merits of the government's case, perhaps the kindest expression describing it comes from a quote from Plato's *Phaedrus* in that: "Things are not always what they seem; the first appearance deceives many; the intelligence of a few perceives what has been carefully hidden."

This combined factor which is to now be considered in determining the appropriateness of any order resulting in the pre-trial detention of the Defendant has been extensively set forth in both the Defendant's prior Motion for Reconsideration of Order of Pre-Trial Detention (DE # 42), and in his Reply to Government's Opposition for

Reconsideration of Pre-Trial Detention Order (filed under seal), which pleadings are incorporated herein by reference and made a part hereof for the record.

Since the date of the detention order review hearing before the Magistrate, the Defendant has now had the additional benefit of having obtained and reviewed most all (according to the government) of government's newly provided automatic discovery, although it had initially been due in its entirety by June 4, 2015.

In addition thereto, there is attached a copy of ▌▌▌▌▌▌▌▌▌▌ government's very last witness. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌▌▌▌▌ ("Exhibit C" attached hereto) is that of ▌▌▌ ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ ▌▌▌▌▌▌▌▌ just 3 months ago, and being out of the proverbial horse's mouth ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ it provides the best possible classic summation and characterization of the weight of the government's case:



...



In order to place the foregoing colloquy fortunately and responsibly that was initiated by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in its proper context, the ▮▮▮▮ referenced therein was that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of a co-defendant (one of the alleged co-conspirators), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ extensively discussed and commented upon in the Defendant's Reply to Government's Opposition (filed under seal).   Additionally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. But, as ▮▮▮▮▮▮▮▮▮▮▮ truthfully confirms under oath, there simply is no evidence that the Defendant had actual knowledge of laundering of drug money through his own business activities, or that he was somehow knowingly engaged in any conspiracy (Count I) the purpose of which was that of laundering drug money – as the indictment has inexplicably charged.

This is certainly not surprising ▮▮▮▮▮▮ testimony ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.   However, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 4 weeks later (April 8th) the Defendant was arrested on this indictment, and has since that date been languishing in pre-trial detention.   Additionally, all ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ confirm this very same basic fact – there simply is zero evidence that the Defendant was in any way, shape or form knowingly or intentionally engaged in the laundering of drug money – ever!   The most obvious explanation for this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is that the Defendant never did in fact ever knowingly or

intentionally engage in the laundering of drug money at any time since he began his financial services business back in 2006.

However, what the extensive government discovery evidence does confirm, although perhaps unintended by them, is that the Defendant for many years up until the time of his arrest on this indictment enjoyed a very successful international financial services business, and therefore had absolutely no need to undertake any unnecessary high risks by engaging in any unlawful activities. (See, "**Exhibit A**".)   To the contrary, what the evidence will clearly show at the time of trial through extensive supporting documentation, that the Defendant went over and above the usual and customary requirements in the exercise of proper due diligence -- not for some or most of his business transactions, but indeed for all of them.

Finally, with respect to Counts II and III, there may have existed a semantically generated debate as to what the Defendant did or did not have personal knowledge of ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ However, the primary language of the Defendant is Spanish, and although his spoken English and communication is quite good, his entire thought processes are exclusively in Spanish. However, the language impediment aside, the objective facts are:   (a) the Defendant certainly never did work with the co-defendant on a daily basis, and their relationship has always been just that of a creditor-debtor in which the co-defendant remains indebted to the Defendant arising out of lawful ordinary purchase order financing transactions; (b) the Defendant's contacts and communications with the co-defendant were infrequent and businesslike in the usual and normal course; (c) the Defendant and the co-defendant always ran their own separate and distinct business operations (co-defendant engaged

14

in the import/export business of textiles, food, etc.), each business operation being totally based and headquartered in different countries.

The insignificant miscommunications that apparently gave rise to these Counts II and III in the indictment, it is respectfully suggested, could easily could have been resolved by a simple inquiry by the government.   The Defendant most easily could have explained and proven through the pertinent due diligence and transactional documentation that had been involved as part of the subject lawful business transactions undertaken by the Defendant – had he just been asked to explain the same, and was provided the opportunity to do so. Otherwise, this is not a big deal beyond the inconvenience of all concerned with the need now to have this simple, clear and unambiguous explanation presented at the time of trial. Notwithstanding the logic of such a common sense approach, the government apparently decided upon the shoot, ready and aim approach in initiating this expensive and time consuming criminal proceeding against this Defendant, involving thousands of pages of normal business transactional documents that for the most part are totally irrelevant to these proceedings -- beyond that of proving that the Defendant was engaged in a very successful and lawful financial services business.   This business includes as its clients major companies such Hewlett Packard, and many other such well known household name companies, that primarily are importing goods of all kinds into Venezuela.

    (c)    **18 U.S.C. §3142(g)(3) – Defendant's History and Characteristics; and**

    (d)    **18 U.S.C. §3142(g)(4) – Nature and Seriousness of the Danger to the Community That would be Posed by the Defendant's Release.**

In the interest of the efficiency of court's valuable time there is no need to further expound on the obvious as to these specific factors. As previously discussed, the Defendant is of solid moral character being well-grounded in a lifetime of religious practice and beliefs, he has no prior criminal record or history, has a long history of ████████████████████████ in every way, and he is the head of a caring, loving and wonderful intact happy and successful family.

## V.  CONCLUSION

In consideration of the totality of all of these facts and circumstances, the Defendant certainly does not represent a flight risk, he has more than a reasonable and objective basis for optimism that he will indeed be vindicated at trial, and he has every motivation and reason to appear to successfully defend himself at a trial in order that he may then resume his wonderful family life, and to restore his business to its past experiences of success.

In this context, it is respectfully requested for this Honorable Court to adopt the reasonable and appropriate recommendations of the Pre-Trial Services, to wit:

Provide a percentage bond with the following special conditions:

- Report to the United States Probation Office as directed;
- Surrender all travel documents and do not obtain any new ones during the pendency of this case;
- Do not visit any transportation companies, transportation facilities or any other related travel establishments;
- Reside only at the residence located in 19707 Turnberry Way (Apt. # 24D), Aventura, FL 33180.

16

- Travel restricted to only the Southern District of Florida and the District of Massachusetts.

WHEREFORE, The Defendant respectfully moves this Honorable Court to review the existing order for the pre-trial detention of the Defendant in this matter, and upon consideration thereof enter a superseding order that appropriately provides for the release with conditions as the court may deem proper.

DATED:   June 22, 2015

Respectfully submitted,

NATHAN P. DIAMOND, P.A.
888 Biscayne Boulevard, Suite 501
Miami, Florida   33132
(305) 371-5300
Fax: (305) 371-6966
attydiamon@aol.com

By:   /S/ Nathan P. Diamond
NATHAN P. DIAMOND, ESQUIRE

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 24, 2015, I hand delivered or electronically filed the foregoing document under seal with the Clerk of the Court using CM/ECF.

By:   /S/ Nathan P. Diamond
NATHAN P. DIAMOND, ESQUIRE

17

# EXHIBIT A

# (FILED UNDER SEAL)

# EXHIBIT B

# (FILED UNDER SEAL)

# EXHIBIT C

## (FILED UNDER SEAL)